You may be seated on this beautiful sunny day. I do have to announce that Justice Litton is unable to be with us today due to health concerns, fairly routine concerns, but he will be listening to the oral argument and we'll be conferencing the case with him later. Case number 313-0368, Lauren Gillum v. Mr. Edgar Lynn Midwest Real Estate Accountant by John Wren v. Michael and Linda Tarochione, athletes by Daniel Portis. And Mr. Wren. May it please the court, the opposing counsel. This is a procuring cause claim brought by a real estate agent for a lost commission. In this case you have a real estate agent who brought a buyer to a seller. The seller and buyer met. The seller delayed the sale until the contractual right for a commission ended. The seller told the buyer about the time frame for that commission period, and after the six-month time frame ran, the buyer re-contacted the seller, they renewed negotiations, and the sale was made. Now you said the seller delayed the sale? Yes. What evidence is there of that? What happens is on the last day of the listing agreement, September 15th, 2005, the buyer came and met with the seller, came out to the farm, walked around the property, and the buyer indicated that the seller indicated he didn't want to pay a commission. He said that there was a six-month time frame for paying the commission, and he gave the buyer his phone number and basically said don't call me back for six months. He ended up, six months later, the buyer went home, put it on his calendar on the fridge, particularly to remind himself to contact back in six months. And he contacted the seller and they resumed negotiations. When was the transaction consummated? The transaction was not completed. The closing wasn't until about December of the following year. Okay, so about six months after the broker exclusive. Yeah, actually even a little bit slower than that, later than that. I think the agreement… But it's sometime thereafter. Yeah, within the year after. And there was some difference. I think actually the seller sold the property at a higher price than what the listing agreement was. There was some change in land value during that time frame. So your position is the awareness of this property being sold was through a listing by your client? Yeah, I don't think that's disputed at all. That's not disputed? No, I mean what happens is after the listing agent and the seller sign the contract, the listing agent posts the property on BuyIllinois.com. The buyer is somebody up in the suburbs of Chicago. He sees it on the internet. He contacts the listing agent. The listing agent takes him to the property, shows him the property. There's actually a couple of bids on the property during the time of the listing agreement, which are rejected. And after they've been rejected is when the buyer comes directly to the property. Did the buyer make any of those bids? Yeah, the buyer made two bids during the time of the listing agreement. Counter-offering? There's some conflicting evidence as to a counter-offer. There's some evidence that there was a counter-offer. There's some evidence there wasn't a counter-offer. But definitely the bids were rejected. Well, actually the buyer says that when he talked to the seller, the seller said that he never knew of the bids. But the agent stated that he did relay the bids to the seller and that the seller rejected them and he relayed that back to the buyer. The seller actually never testified because the court granted directed verdict on this before the defendant's case. Is there any evidence that the ultimate buyer was looking at other property? There is some testimony by the buyer that says that he was. He also said that he wasn't interested in the property at the time he came out there, which seems odd that he would have traveled out to the property in the middle of Knox County to go see the property. It also seems odd that he then would have calendared the six-month time frame on his calendar when he got home and recontacted as soon as that six-month time frame came up. But the buyer did say that he had interest in another piece of property at some time. I don't think that that's really that significant if you just look at the procuring cause case law, in that the broker was clearly the person that procured this sale that got these two together. They consummated the sale within a reasonable time after the expiration of the grace period. Two questions here. One is what is our standard of review here of the trial courts? It's a directed verdict, correct? Yes, it was a directed verdict. Well, that's what we called it in the trial court. I guess I know more about it today than I did at the time. Next time one of these happens, I guess I'll be a little more on top of the game. But the defendant did ask for a directed verdict. The court granted its ruling in terms of directed verdict, although it looks like because it was a bench trial, there's a potential that there's a more deferential standard of review. It appears, though, from the cases that there's a two-prong process where they first look and see did the plaintiff present a prima facie case, and if not, that portion of the claim or the directed verdict or the motion for judgment by the defendant is reviewed de novo. If, on the other hand, the trial court gets past that stage and starts weighing the evidence, then there's a more deferential manifest way to the evidence standard. In this case, the trial judge called it a directed verdict and in his ruling says, viewing the evidence in favor of the non-moving party, I'm finding for the defendant. It doesn't sound like, if you look at his ruling, he made any credibility or weighing of the evidence decisions, which I think would fall into the de novo standard of review. Well, arguably, maybe not. Well, even if it doesn't, I think that we're still on solid footing on this appeal based on his specific findings. In his ruling, he specifically found that the seller delayed negotiations to avoid paying a commission. And that falls right in the wheelhouse of the Podlowski decision, which it came back on other grounds, did not find the seller entitled to a commission or the agent entitled to a commission, but it said because the trial court found no evidence that there was delay to avoid paying a commission. And in this particular case, the judge's ruling, his findings were that the defendant delayed the sale in order to avoid paying the commission. So if that's the case, I mean, just getting out of the way we characterize these motions, etc., is that if we take that and we defer to that finding, that factual finding, then you would argue as a matter of law, in the procurement law, case law, that directed finding should be in favor of your opinion. Absolutely. I mean, I think that you look at the judge's findings of what happened, and I think that's clearly what happened when you look at the evidence and the testimony of the trial. This is exactly the kind of case that the procurement law was designed to address. I mean, what it is is it's based on unjust enrichment, and what it is is we are not making, never filed a breach of contract claim. We're not saying we have a right to a commission for breach of contract. What we're saying is this is exactly the kind of case where a buyer finds a property based on the help of the agent. The agent brings them to the seller, and the seller doesn't make the sale to avoid paying the commission. And within a reasonable time after that time runs out, they resume negotiations here. It's right at, I mean, there's a six-month mark, and within a month of that, we don't know the exact date, but it would have been end of March, early April is when the six-month time frame would have ran, and that's when the seller says he recontacts the buyer, and they start negotiations. So this is exactly the kind of case that procurement law is designed to address. Which is inequitable. Yes. And the trial court didn't really address, they addressed a number of procurement cases and talked about it in general, but the trial court also in its ruling basically stated that if the agent wanted a commission, he could have made it a contract that basically said, I get a commission no matter when anybody that I find buys the property. And we're not asking for that. We don't think we need that. But I think that sort of shows that the judge may have been looking more at this is a breach of contract case, and the contract doesn't provide the remedy. And that's not what we're saying at all. It also seemed like the judge seemed to be. Well, what are the outer limits? What's that? What's the outer limits of this equitable relief? You have a six-month listing agreement, exclusive listing agreement. You have terms of that agreement, which are contract, which say the broker is entitled to commission, however it's negotiated, if he presents a willing, able buyer to the seller. Correct? Yes. Okay. At the expiration of that agreement, I mean, how far in the future does this go? I think that the old standard fallback for the attorneys is the old reasonable timeframe. I mean, I think that you can envision a time, two, three years, a year down the road, if they come back, that's probably going to be stretching it. I don't think we're into anywhere that we have to stretch it in this particular case, because the buyer marked it on his calendar. I mean, six months I'll call, and when the six months ran, he contacted and resumed negotiations. Well, you understand, as an equitable doctrine, you've got to weigh both seller and, in this case, the broker's rights and arguably what is equitable here. So, I mean, you don't want to bind a seller into the future with no cutoff. I would agree with that, Your Honor, and I don't think that the law establishes and I don't think the law needs to establish some certain date or some certain rule of one year, six months, nine months, three months, two years. I think that it takes into consideration a reasonable time afterwards, and I think in this particular case, the seller, again, made contact right after the six-month grace period ran out of the contract. The seller made contact or the buyer? Oh, God, I'm sorry. That's why I don't do real estate stuff. I apologize. You know, on the two-hour drive up, I tried to practice a little in my head, and I was even catching myself, so God knows how many times I've messed it up here without catching myself. That's okay. I'm surprised I caught it. It was the buyer who contacted the seller. So what evidence did the trial court receive that the real estate broker introduced this particular buyer to the seller at a time when the buyer was ready, willing, and able? Okay. Because the fact that the buyer became able later doesn't necessarily justify commission in my simple mind. Okay. Well, there's a couple different things. One is there's three different ways an agent gets an agreement or gets a commission. One is to find a buyer ready, willing, and able within the contract. That's one. Do you think that was done? No. Okay. No, and I don't think that the procurement cases don't require us to prove that. I mean, that would be a breach of contract claim if they did that. If, in fact, they had ready, willing, and able during the time of the contract, we wouldn't even be talking about procurement.  Okay. The other is if you're a procuring cause sold during the exclusive listing or the grace period time frame, which is that ready, willing, and able, and then there's also through the procuring cause, which is you bring the buyer and seller together. You're the one who made or helped the sale go through, and it did not happen during either the exclusive listing period or, in this case, there was a grace period after the exclusive listing period. But the seller didn't, based on the evidence the trial court heard, the seller didn't know this buyer made an offer. Isn't that true? That is what the... The trial court heard. That's what the buyer told the court that the seller said. I don't think that that makes any sense at all under the context of this case. The broker told the court. No, the broker never told the court that. The broker said that the offers were relayed to the buyer, or to the seller, and the seller rejected them. This was a relatively new real estate sales agent, but he was interested in earning his commission. His pay is based upon his commission. I don't think there would be any sense at all... But what did the seller say? The seller didn't testify. Okay, so all we have is a buyer getting hearsay. Yes. Because the buyer is saying, the seller told me that. Yeah, exactly. So finding out about the property on an Internet website, do you think that's enough? I think it would be enough, yes. But in this case we have more. We have beyond finding out about the property on the Internet website, the buyer then contacts the agent. The agent sends him additional information. Then the buyer and the agent meet at the property, walk around the farm, show the property, and then there's negotiations through the agent with the seller. So I think we have more than that. But, yes, I think on a pure legal theory, yes, I think that if the agent does identify the property on the website and then the seller finds it through the agent's activities, then they could be entitled to a procurement claim. Was there a rational relationship between the price agreed upon for the ultimate sale? I think it was a year after the listing agreement ended, and the price discussed during the listing agreement. What was that relationship? Hopefully I understand the question. I think the initial listing agreement had a $742,000 price. If that offer was made during the contract time frame, then the seller was agreeing to accept that and there would be a deal. I think they got as close as $720,000 by the buyer as far as his offer before the listing agreement expired. When the buyer contacted the seller again after that 6-month time frame came, the seller told the buyer, hey, prices have been going up out here. The buyer then said, well, I might need some assistance with financing. They talked back and forth about contract per deed. The buyer actually bought it for $810,000, which is about $68,000 more than what the listing agreement was provided for. So that's a pretty big gap. How does that go into your theory of procurement? The difference between the ultimate sale and the price posted during the agreement period and negotiations even then. I think that if one shows that, and this has been a big point by the defense, that, oh, there must have not been collusion between the buyer and the seller. Why would they collude if they were just going to pay more? And I agree. I don't think there was any collusion between the buyer and seller. I think what there was was an agreement that you're not going to negotiate with me until that 6-month time frame runs because I don't want to pay a commission. But as far as the benefit goes, I think there's even a bigger benefit to the buyer. I mean, the buyer, or not to the buyer, to the seller. The seller wanted to clear $690,000. I think if he pays a 7% commission on this, he would still clear $60,000, $50,000, $60,000 more than what he wanted to do. Based on his efforts, though. Based on his efforts. The ultimate purchase price was more than the property was even listed for. Yes, that's correct. And, again, I don't know if you want to say based on what efforts, one way or another. I mean, I think that was based on real estate out in the country having a significant jump over that time frame. What if the seller, if I have it right, went to another real estate agency and listed the property with someone else? And they sold it for $800,000 and something. My guy wouldn't have any claim under the procuring clause for that. I mean, if he went to another agent, the agent found a new buyer, and that buyer bought the property. No, same buyer. Same buyer. No new tour. Nothing. I guess that would be an interesting question. As far as the circumstances, I mean, he gets a new broker, and then who contacts who? Does the new broker contact the seller? The potential buyer walks in the door of the new real estate agent and says, you know, the property I was looking at fell through. I'm kind of thinking about this one again. And the second real estate agent says, oh, well, now it's $800,000 and some thousand dollars. That's an interesting question, and I don't know the answer to that. Interesting questions are us. Yeah, I know. The agency would have an argument for it, but I think it would be a tougher argument if there's another agent that stepped into place and is part of the negotiations. So here's another tough question. If you prevail and we see the case the way you would like us to, do you think you're entitled to the percentage commission on the price above the listing agreement? I don't know that. I think that there's a good argument to be made that he'd be entitled to 7% of the 742, and I frankly anticipated asking for the 7% of the 810,000, but I envision the court potentially awarding 7% of 742,000, and I didn't find any case law one way or another on that. So I think there could be a good argument by the seller that the limit should be for 7%. We'd argue that he gets the benefit of the bargain, unjust enrichment. He doesn't get the benefit of the bargain. He gets the benefit of our work that we prepared for him, and to compensate the agent, he should be entitled to 7% commission on what the seller gets, but I could see the court saying I'm going to cap it off at 7% of the 742. Actually, I enjoy that you asked some questions instead of me trying to read my notes here, so thank you for that. We enjoy it as well. That's the benefit of having oral arguments because we get to pick your brain. Well, I do think that there's no case that's clearly on point. The best one is Pawlowski for us. I think with the court-specific finding that there was delay. I think that the cases cited by the seller are pretty easily distinguishable in regards to the facts of this case, but the other cases also do show more continuing negotiations that they'll point out as far as the cases that are favorable to us, and there was a six-month break in contact there between the seller and the buyer, but I think that was at the direction of the seller. Thank you. Good morning. May it please the court and opposing counsel, my name, again, is Ian Cortis, and I'm present as counsel for the sellers, Michael and Melinda Tarocchione. Justice Holdridge, I wanted to kind of speak to your line of questioning first if I could. I actually think I suppose we could say this in every case, but I think the standard of review is important in this case particularly. I was not counsel in the trial court, but counsel for my clients in the trial court moved for a directed verdict. That was not correct, but I certainly hope we don't elevate form over substance and get hung up on that. The fact of the matter is it was a bench trial, and I would ask the court to consider the fact that, again, not elevating form over substance, Judge Shiplett's findings from the bench, his pronouncement, went on for eight and a half pages in the transcript, and he made a thorough discussion of what he saw as the issues and made his findings, and I don't think we can, in a cold transcript necessarily here, viewing things in hindsight, sit there and say, well, he didn't specifically set out that he was doing prong one and then he was doing prong two, prong one being did the plaintiffs present evidence on every element of a prima facie case, and prong two assessing the credibility and demeanor and the body language and the truthfulness of the witnesses, I respectfully submit to the court that, of course, the trial judge did that. Fred does that in every case. He does that in every case, and he concluded that the plaintiffs were not going to be able to carry the burden of proof at the end of the day, regardless of what my client's case might have been in the trial court. I also would, again, I would say, obviously, in every single case I could say this, it's before this court, but I think that the record, I think that a close review of the record and the testimony really is important in this case because, you know, for example, it's been suggested that my client, Michael Roccioni, who met with Mr. Zimmerman in mid-September 2005 on the day that the listing agreement was going to, was set to expire, the initial term, you know, at the record at page 21, Mr. Zimmerman testified in response to a question, did he, meaning Michael Roccioni, in fact, give you a phone number? Yes, I asked him for his phone number. That's one distinction that I wanted to point out. I think that that's important because, you know, obviously, in the most general sense, the claim is being made that the broker is entitled to his commission because my client was playing games. He was acting in bad faith. And that's just one example on the record as to, no, Mr. Zimmerman asked him for his phone number. And my client went on to say he had no intention of calling him. He had no intention of calling Mr. Zimmerman. If Mr. Zimmerman was interested in his property, Mr. Zimmerman could call him. I also would point out that the Schaller case is clear that it is not enough that the broker was the first to bring the property to the attention of the buyer. And certainly in the Internet age, I think that that's a good policy and that's good case law. It is not enough that this gentleman from the Chicago suburbs saw this piece of property on the Internet and that that was the impetus for him to come look at it. There's no dispute that that occurred. Broker shows Mr. Zimmerman around the property once in late May, early June of 2005. Two offers, don't know if they were submitted to my client or not. Two offers are made, two offers are rejected. Judge Shiplet was absolutely correct that my client wasn't going to accept any less than $742,000 of gross because he wanted to clear $690,000 after commission. That was not bad faith. As Judge Shiplet absolutely correctly pointed out, my client drew a line in the sand and he had every right to not step over it. So two offers are made, my client doesn't accept them if they were even conveyed to him. Then there is not a shred of evidence that suggests that my client contacted Mr. Zimmerman and asked him to come out to the property in mid-September 2005. The unrebutted testimony was that Mr. Zimmerman, the eventual buyer, was in the Peoria area on business and casually stopped by the property to look at it. If my client was playing games and acting in bad faith, the unrebutted evidence would not be that when asked by Mr. Zimmerman if it was still listed for sale, my client said, yes, it's listed with Mr. Griswold for another eight hours. You wouldn't see that. You would avoid, you would deflect if my client was acting in bad faith. I also think that it's important that Mr. Zimmerman didn't pick up the phone or get on his email or send a text message to Mr. Griswold saying, hey, this listing agreement is expiring and I want this property and let's get something done. Didn't do that. In fact, the testimony was that Mr. Zimmerman, without any involvement of my client, had told the agent, Mr. Griswold, right before the mid-September 2000 meeting that his daughter was going to college. He was buying her a house. He was no longer interested in purchasing the property. Couldn't afford it. And then there was some testimony that shortly after the expiration of the initial term that the agent contacted Mr. Zimmerman and Mr. Zimmerman said, I'm looking at property in Ogle County. I'm not interested. That has nothing to do with my client. Those are independent, intervening statements, testimony, events, whatever we want to call them, that break any causal connection between my client, as I've been saying, playing games, and Mr. Griswold. And then there's Mr. Zimmerman later on testified that he contacted my clients again after offers that he had put in on other properties fell through. And there was conflicting testimony actually. I know Mr. Wren was talking about this gentleman putting a tickler on his calendar on the fridge and there was testimony to that effect. But again, I think that that is why, Justice Holdredge, I say that I think the standard of review is very important because Judge Shiplett was sitting there assessing the testimony and the credibility of witnesses. And under the manifest weight of the evidence standard, it certainly seems that Judge Shiplett concluded, well, this gentleman was interested in other ground. He moved on when his efforts to purchase other ground didn't come to be. He went back and spoke to the Tarocci on this. That was obviously Judge Shiplett's conclusion. And I think that it's entitled to a deferential standard of review. How did this calendar on the refrigerator come in? I understand your client didn't testify. He didn't. Mr. Zimmerman had said that there was discussion with my client at his farm in mid-September 2005 about the fact that there was a six-month grace period. I think that the record and the testimony is a little unclear as to whether Mr. Zimmerman just decided to six months out, circle back around with my clients, or if my clients perhaps told him, well, there's a six-month grace period. The six-month grace period is at the expiration of the listing? The listing was in effect from mid-May 2005 to mid-September. So that's what I call in my brief the four-month term. And then there's 180 days, a six-month grace period after the conclusion of the initial four-month term. Right. So if anything happens within that six months, the agreement of commission is still good. Is that right? That is correct. Okay. That is correct. So in effect, this agreement is how long initial term plus six months. Otherwise you wouldn't be here. That is correct. Okay. I would say it's a complete beginning-to-end, it's a ten-month window. That's right. Yes. Okay. Yes. So who's testifying as to a magnetic calendar on a refrigerator with something circled? The buyer, the ultimate buyer, Mr. Zimmerman. Oh, he's saying I saw it? No, he was saying that, well, I put it on my calendar to follow up with the tarot. I put it on my calendar. Oh, okay, so it's Zimmerman's calendar, not your client's calendar. That is correct. Okay, good. That is correct. Let me ask you a question about the procurement case law. It's pretty clear that the trial judge found there was no collusion or bad intent. Absolutely. Can you still be a procuring clause without bad intent? Can there still be plaintiffs still have pre-bail? Yes, I believe so. So why do you think the judge focused on this collusive issue? Well, I think Judge Shiplett was correct to observe that the law is, you know, the agent was under a duty to act in good faith, and my clients were under a duty to act in good faith. And he found that they did? And he found that they did, correct, for at least a couple reasons. One, you don't tell the buyer. It wouldn't be too far of a leap to conclude that if you're my clients and you're wanting to act in bad faith, you don't tell the buyer on the day of the expiration of the listing agreement that, oh, yeah, it's still for sale through my agent for another eight hours. Call him. Sure, absolutely.  He wouldn't have been breaching the contract with the agent because, you know, the contract would have required him to funnel all, you know, potential interest through the agent. That would have been the only appropriate thing to do, and that's what he did. And I also think, and Mr. Wren brought up my point that I had made, that if you're Mr. Zimmerman, if you're the buyer, if you're really interested, if you really think that that property is something you can buy, you get on the phone. And even if you don't make it happen that day, within those eight hours, you latch onto it like a dog on a bone, and you don't let it go, and if you get it done the next week, you get it done the next week, or the next two weeks, you get it done. And then there would be this unbroken, you know, causal connection. You would get it done. You would negotiate. Following up on the unbroken causal connection, did your client do anything to advertise the property after the listing agreement and the grace period expired? He did not. He did not. There was some evidence in the, there was some testimony in the record, again, from the buyer, because my client's case was never put on. He never testified. The buyer left my client's property in mid-September 2005 under no misconception that that property was just not for sale. My client wasn't interested in selling it. And there was also testimony that my client only listed it originally because the agents had indicated they might be able to get, quote-unquote, big money for it. And that's okay. My client can do that. He can say, well, you know, I'll put it on the market. I'm going to get every penny that I want out of it. I don't have to sell. You know, he's not somebody who's listed their property and has to sell. He wasn't that guy. But if the buyer and seller would have never crossed paths, but for this Internet website? Yes, Judge, and Justice, I'm glad you raised that point. You're both. I'm glad you raised that issue, because that was kind of what I was going to transition into next with my comments. And, you know, if we look at the case law, and actually I think a review of the cases cited by Mr. Wren and his clients are actually very instructive by way of contrast. If you look at the Bennett and Conweller case at 133, 3D, 316, and you look at the Payne and Wetzel Associates case at 174, 3D, 999, and the Lyons case, 133, 3D, 820. You don't need to get the size. Don't eat up your time giving us numbers. They're all cited in the briefs. And the Griswold case and the Arthur Rubloff case and the Stone case. And I don't need to bore Your Honors with all the details of every one of those decisions. But if you look at those decisions, there is an agent who is doing something. That string never gets broken. It might get broken for a little bit, but not very long. The broker's following up, hey, keep me posted on these negotiations that you're now doing by yourself to the client. Well, actually, in these cases, especially with large companies, sometimes the business people say, hey, thank you, agent. We've met each other, and now we're going to do a little bit of negotiation by ourselves. And the agent keeps tabs on it. Why do you think? Well, sure, they want their commission, and they're entitled to it. But those people in the case decided by Mr. Rubloff. They're entitled to it because why? They're entitled to it because there was a causal connection. The negotiations continued. Oh, continued negotiations. But you gave an example of this person is brought to a cellar, and the two parties say, sorry, get out of the office. We want to talk. I mean, that's a pretty cut-and-dried action by the broker. I introduced them. Correct. I did nothing more. Correct. Is that enough? No, it's not. Okay. No, no. It would absolutely not be enough under the shallower authority, and frankly, kind of under a logical slippery slope thought. I think that that is a very slippery slope, especially in the Internet age and what have you. But in the case decided by Mr. Wren, the agent continues to negotiate. The agent is continuously involved in the situation. He's picking up documents. He's running here and there. They're doing things. They're doing things. And here the evidence is simply the land in Knox County is posted on the Internet. Agent shows the property to the ultimate buyer once in May or June, late May, early June 2005. Two offers, none of which meet my client's bright line threshold. No deal. No ready, willing, and able buyer, as you pointed out, Justice Wren. Agent contacts my client towards the end of the listing agreement. Do you want to extend it? No, I don't. Contacts Mr. Zimmerman, the ultimate buyer. Are you still interested? No, my daughter's in college. I don't have the money right now. I'm looking at other ground in Ogle County. That's it. There is no e-mail. There's no evidence of e-mail, text message, phone calls, letters, in-person visits. That's it. That's it. But we're still dealing with that eight hours issue, though. I'm sorry? You still have that eight hours left on the agreement, listing agreement. Am I correct? And you're where there is some dialogue between buyer and seller at that point. Yes. Yes. Yes. And you're saying my client said, I have eight hours of an agreement left. Arguably, somebody said that, whether it's hearsay or whatever, because your client didn't say anything. But somewhere along the line, eight hours came up that I'm still bound by the agreement. Am I correct? Correct. Okay. And then you had said, well, the buyer could have gone to the agent at that point if he was serious. Right. Right. Now, why would he do that when he's told, allegedly, that the seller doesn't want to pay a commission? Because ultimately, your client wants more money in their pockets, their clients, which is understandable. Correct. Wouldn't they have more money if there was no commission paid? I mean, in other words, could the buyer offer the same price and no commission, there'd be more money in the pocket of the seller? Yes, but I don't think we can view that in a vacuum. I think you could say, well, my clients would have to wait for it. Maybe they wouldn't want to wait. Maybe they wouldn't want to deal with a whole other sales process down the road. So maybe they were done with it. But yes, I think that's a fair point, but I think there are other directions that could be taken, too. How far apart are the buyer and seller located geographically from each other? Ultimate Buyer lived in Palatine at the time, and my client lived in Knox County. Boy, I'd say three hours. The reason I ask that, I actually know where Princeville is, if you can believe that. Oh, you've been to the center of the universe. I have. All right. This isn't a situation where the Ultimate Buyer drove by the property and saw a sign out in the yard. This is a situation where the Ultimate Buyer found the property on the vast expanse of the Internet. I am electronically challenged. There is no way I could ever sell my property on the Internet. I can't post a picture. I don't do Facebook. And I get a sense, just from looking at the record, that perhaps your clients are a lot like me. I actually can't answer that. I don't know. So what are the chances that a guy from Palatine would even find out about this property in Knox County without the realtor's involvement? I don't know. I think we would all be speculating. I think that there's, for our purposes today— So you understand my point, and can you address it? Yes, I certainly understand your point. I would point to the Schaller case in the point that—and actually, I'm not in the habit of citing cases from 1899, but there's— Well, then you don't know Justice Carter very well. You know, there's an interesting discussion in the Davis case where they just talk about how the efforts of an agent may ultimately lead, down the line, to a deal being consummated. Impressions are created. Connections are made. But if there's not that connection down to the end— You've answered my question. Thank you. Thank you for your time. I appreciate it. Thank you. I'll try and address a few points that came up during that argument. First off, there was a point of why didn't the buyer contact the seller after that September 15th date until March or April of next year? Well, if you look at—circle back to the judge's ruling from the bench again, and the judge said—he's making his ruling and his findings, and he says, After two rejections, Mr. Zimmerman then casually visited Torsione on the last day of the active listing and inquired if it was still for sale. Mr. Torsione said, Yes, through my agent for another eight hours. After that, I'm not selling for six months because I'm not paying a commission. I mean, if he's not selling for six months because he's not paying a commission, I don't think a buyer's going to be on the phone trying to sell and make a deal. I mean, he's waiting until that six months runs, which is why he goes back, the buyer, puts it on his calendar on his fridge, marks it to call back in six months. Once the six months runs, he contacts the seller, and they begin negotiations for the sale of the property. As far as the actual agreement goes, what it was was there was a four-month listing agreement from May to September 15th, May 15th, September 15th, and then after that there's a six-month grace period. During the grace period, if a buyer who was brought to the seller by the broker sells the property, that's when the broker gets a commission, and that's the contractual right during that grace period. I think the court clearly found that the seller was trying to avoid payment of commission, told the buyer, don't call me for six months, six months runs, the buyer contacts the seller. The buyer read the contract, he knew the contract rules, but he didn't realize the concept of procurement that's out there by the courts and equity to try and keep somebody from taking advantage of a real estate agent who goes out, finds a buyer, and then after the time frame goes, they sell it to that, or finds a buyer, finds the seller. I think I'll get this down. I apologize, but makes the sale to avoid the commission. As far as the Schaller case, that was brought up a number of times by opposing counsel. Schaller was not a direct verdict case. It was after a trial, and I'm not even if Schaller was a procurement case. If you actually look at the Schaller decision, they never talk about the complaint, what theory was coming forward. There is a subheading above the discussion about procurement that says contract claim, which makes it sound like it was a contract claim, and then the most significant point is in Schaller, the trial court made findings that it wasn't clear when the listing agreement was, or it wasn't clear from the evidence as to whether the buyer got in contact with the seller during the listing period. And so the court, I think it was addressing a breach of contract, but it did talk about procurement. There was procurement discussions in there. As far as the Davis decision, that's another decision cited by the defendant, and that goes back to 1888. And in that particular case, there was a broker. The broker did not get the sale done, and then a year later, there's a different broker that steps in, and they suggest trading the property instead of selling the property. I don't think that that is in any way anything that undermines a finding of procurement and the commission for our client in this particular case. I would ask the court to also look at the Stone decision. There was some sort of indication in the argument that there had to be a repeated effort, lots of work done. I think the Stone is a fairly recent third district decision, reversing a directed verdict on one of these cases, where the court found there was sufficient evidence that the directed verdict should not have been granted. In that case, it wasn't real clear it was the sale of a Toyota, ground for a Toyota lot in Peoria, and it was some contact with one person who may or may not have been an agent for the ultimate buyer. But it wasn't like there was repeated contact, repeated negotiations, repeated efforts. It was the finding of the buyer that got connected to the seller. I think we have more than enough to support a procurement judgment in this case. So what are we fighting over, or what are you fighting over? Is it about a $50,000 commission? Yes. And if we see things your way, it would go back to the trial court just for the second hand. Just because I'm not smart enough to figure out, I wish I could figure out that you guys would say as a matter of law, look at the judge's specific findings, under these findings, it falls right under Podlowski, and there should be a directed finding for the plaintiff, but I don't know how to do that. So I mean, I would ask you to direct it to the trial court, and I don't think there needs to be... That's not what you requested in your brief, though, is it? No, I did not request it in my brief. If there was a way, I guess I blew it as far as doing that, but I'm requesting... Your phone should be jumping up and down right now. Yeah, no, well, I think that it would be... If Mr. Schmidt were here in my place, I know what he would say, and he would say, you guys better talk. You guys need to talk. Because you're talking about $50,000. Some very fine attorneys here that have done a marvelous job of arguing both sides of this case. Are there any other questions? We will be taking the matter under advisement, and it's going to take us some time, because we have the conference with Justice Litton as well. So we will render a decision without undue delay, but with some delay. Thank you.